**ATLANTIC MUTUAL INSURANCE COMPANY, Plaintiff-Appellee, Cross-Appellant,**

v.

**TRUCK INSURANCE EXCHANGE, Defendant-Appellant, Cross-Appellee.**

No. 85–2228.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1986.

Charles W. Kelly, James E. Ross, John W. Stevenson, Jr., Houston, Tex., for defendant-appellant, cross-appellee.

John K. Meyer, Houston, Tex., for plaintiff-appellee, cross-appellant.

Before WILLIAMS, GARWOOD and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

This is a suit by Atlantic Mutual Insurance Company (Atlantic) against Truck Insurance Exchange (Truck) arising from Atlantic's settlement of a claim brought against Santini Brothers, Inc. (Santini), which had property damage liability coverage from both insurance companies. Atlantic brought this diversity action seeking contribution from Truck for the settlement funds and defense costs that Atlantic expended on behalf of Santini in the underlying property damage suit against it. Following a bench trial, the district court granted Atlantic a portion of the relief it sought. Truck appeals the district court's determination that its policy covers the loss asserted in the underlying suit against Santini and that Truck shares that liability coverage with Atlantic. Truck also challenges the district court's finding that Atlantic's settlement was reasonable. Atlantic cross-appeals the district court's particular apportionment of the liability and the defense expenses, and the district court's denial of attorneys' fees incurred in the present suit. We affirm.

## Facts and Proceedings Below

Prior to the events that resulted in the settlement of the underlying suit against it, Santini had obtained liability insurance coverage for various types of property damage. Atlantic issued a policy to Santini covering certain property damage up to $2,000,000. Santini obtained a similar policy from Truck for $1,000,000 coverage. Santini also procured excess coverage over Truck's primary policy, consisting of a $4,000,000 policy from Aetna Casualty & Surety Company (Aetna) and a $5,000,000 policy from Midland Insurance Company (Midland) for the excess above Aetna's excess coverage. The Aetna policy refers to the Truck policy as underlying insurance, and the Midland policy lists the Aetna policy as underlying insurance.

In 1975, Dresser Industries, Inc. (Dresser) negotiated two contracts with China National Technical Import Corporation (CNTIC), an arm of the government of the People's Republic of China, for the sale and transport of oilfield and related equipment. The contracts required Dresser as seller to arrange for packing of the equipment for transport with materials suitable to prevent damage caused by moisture, rain, rust, or corrosion. In addition, Dresser was obligated to repair, replace, or compensate CNTIC for any damage due to "unsatisfactory packing or defective preservation." Thereafter, Dresser contracted with Santini for export packaging of the materials. The contract contemplated that Santini would crate the materials at its Houston premises and store them until shipment. Santini agreed to use "moisture vapor proof packing." Santini also warranted that all the packing would be performed in a workmanlike manner and agreed to indemnify Dresser against any property damage claims resulting from the Santini work.

Dresser delivered the equipment to Santini's Houston premises from about November 1976 to April 1977. The first packages were completed about February 1977. The equipment was wrapped with moisture vapor proof material and then heat-sealed after desiccant had been placed inside to absorb moisture. In addition, a wooden crate was constructed outside the moisture proof material. As each piece was packed, it was placed in an open yard for storage at the Santini premises in accordance with the Dresser-Santini contract. After the packaging was completed in May 1977, the equipment was shipped from the Houston docks to a Chinese port, except for a small portion, primarily computer equipment, that was shipped by air. The equipment reached its destination by mid-September 1977. Upon arrival, much of the equipment, including that shipped by air, was found to have suffered considerable damage from moisture that had entered and had been trapped inside the packaging materials.

Although Dresser repaired or replaced much of the equipment, CNTIC asserted a claim against Dresser for the remaining moisture damage and the delay in starting operations. This suit ended in a settlement, in which Dresser agreed to deliver

additional spare parts to CNTIC. Dresser then sued Santini for breach of express warranty and for negligence. Santini requested defense from Truck and Atlantic. Truck denied coverage and refused to provide a defense. Atlantic defended Santini and recommended settlement of the claim. Atlantic advised Truck of its recommendation and asked Truck to participate. After Truck refused, Atlantic paid Dresser $850,-000 on behalf of Santini in settlement of the claim. The parties to this suit stipulated that Atlantic also incurred expenses of $46,649.38 in defending Santini and that this amount is fair and reasonable.

Atlantic then brought this suit against Truck, seeking contribution for the settlement funds and the cost of the defense. After a bench trial, the district court awarded Atlantic one-third of the settlement amount, one-half of the defense costs, and prejudgment interest. However, the court denied Atlantic's request for attorneys' fees incurred in the instant suit against Truck.

## Discussion

### Choice of Law

■ Truck first challenges the district court's application of New York law to the case. A federal court must follow the choice-of-law rules of the state in which it sits. *Stuart v. Spademan,* 772 F.2d 1185, 1193 (5th Cir.1985). Texas has adopted the "most significant relationship" test of the *Restatement (Second) of Conflicts* § 6 (1971)[1] for determining the applicable law

in contracts cases, other than those in which the parties have agreed to a choice of law. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984). The law of the state with "the most significant relationship to the particular substantive issue" shall govern the dispute. *Id.* Applying *Duncan,* the district court concluded that "New York has the most significant contact and interest in this issue since New York is Santini's principal place of business and the bulk of Santini's operations and risks covered are in New York.... New York has a strong interest in seeing that Santini recovers under the policy with Truck."

■ The substantive issues in this dispute involve interpretation of both the Truck and the Atlantic insurance policies. The district court focused on the state contacts with the Truck-Santini insurance policy.[2] Because Truck argues that its policy does not cover the property damage and, alternatively, that Atlantic's policy is primarily liable, interpretation of the Truck policy is more significant to this dispute between the insurance companies than interpretation of the Atlantic policy. Nevertheless, an examination of the state contacts with reference to the Atlantic-Santini policy reinforces the district court's conclusion because Atlantic is incorporated and has its principal place of business in New York. New York has an interest not only in Santini's recovery, but also in the appli-

---

1. Section 6(2) of the *Restatement (Second) of Contracts* provides that, in the absence of a statutory directive from the state, the following factors are relevant to the appropriate choice of law:

"(a) the needs of the interstate and international systems,
"(b) the relevant policies of the forum,
"(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
"(d) the protection of justified expectations,
"(e) the basic policies underlying the particular field of law,
"(f) certainty, predictability and uniformity of result, and
"(g) ease in the determination and application of the law to be applied."

2. The district court considered the following state contacts with the Truck-Santini contract:

"1. The contract was issued in Kansas.
"2. Truck has offices in Kansas and it was through its Kansas offices that Truck was notified of Dresser's claim.
"3. Santini's principal place of business is in New York.
"4. Truck's principal place of business is in California.
"5. The bulk of Santini's operations and the apparent focus of the risk covered is in New York.
"6. Both Santini and Truck have offices in Texas."

cation of its insurance laws to Atlantic's claim against Truck.

Truck asserts that the district court erred in disregarding the state contacts with the Dresser-Santini contract and the injury underlying the Dresser-Santini lawsuit. Truck argues that Texas law should apply because this action is based on the settlement of the Dresser-Santini suit. Texas is the place of negotiation and of performance of the Dresser-Santini contract. Moreover, the settlement of the Dresser-Santini lawsuit was effected in Texas based on an injury that occurred in Texas. In addition, Dresser has its principal place of business in Texas.

Truck relies on *Duncan* in urging this Court to look to the state contacts with the underlying suit. In *Duncan*, the widow of a man killed in an airplane crash filed a wrongful death action in Texas against the manufacturer of the airplane. In construing a release agreement arising from the settlement of a prior suit against the airplane owner, the *Duncan* court considered the state contacts pertaining to the prior settlement and the underlying injury. *Id.* at 420–22. The expectations of the parties to the release agreement clearly were significant in determining the effect of the release on the manufacturer's liability. The determination of Atlantic's claim, however, turns upon interpretation of the two insurance policies. Thus, the expectations of the parties to these policies, which we believe point to the application of New York law as to each policy, are more important than the expectations between Dresser and Santini. *See Restatement* § 6(2)(d). With the Truck and Atlantic policies each providing Santini nationwide liability coverage and containing no choice of law provision, the third and fifth factors mentioned by the district court (*see* note 2, *supra*) point with particular strength to the application of New York law, and as to the Atlantic policy, this is reinforced by that insurer's New York situs. Although Texas has a strong interest in Dresser's recovery against Santini, New York has a more significant relationship to the questions that determine Atlantic's recovery. The district court correctly held that New York law applied.

*Truck's Policy Coverage*

Truck's claim that the district court erred in finding that its policy covers the property damage is based on two exclusions in the policy. First, Truck is liable only for property damage that occurs "within the policy territory," which includes:

"(1) the United States of America ... or "....

"(3) anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory."

Truck argues that the district court's determination that Santini's packaging material was sold "for use or consumption" in the United States is erroneous because the material was sold for overseas shipment of the equipment. Second, Truck's policy excludes recovery for damage to "property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control." Truck asserts that this provision excludes liability for any damage that occurred while the equipment was stored at the Santini Houston premises, and thus excludes liability for any damage that occurred outside the United States because it was not responsible for damage during any use or consumption in the United States.

■ Under New York law, Truck must prove that coverage is excluded in this case: "[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case ... and that they are subject to no other reasonable interpretation." *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984) (citations omitted); *see also Neuwirth v. Blue Cross & Blue Shield*, 62 N.Y.2d 718, 476

N.Y.S.2d 814, 815, 465 N.E.2d 353, 354 (1984). We affirm the district court's finding that Truck has not established that its policy excludes coverage of Santini's property damage.

Truck argues that the provision defining the territorial coverage must be construed in light of the exclusion for damage to property in Santini's control. Truck asserts that, although the territorial exclusion is not facially ambiguous, it should be read in the context of the whole policy in an effort to avoid internal contradictions among the provisions. According to Truck, the policy read as a whole indicates that it was not intended to provide coverage during the packing and storage process which occurred in the United States. Therefore, Truck reasons, the packaging was not intended for "use or consumption" in the United States excluding coverage during the overseas shipment.

New York law provides, however, that, when "an exclusionary clause is found to be unambiguous, it must be given its plain and ordinary meaning." *Pennsylvania General Insurance Co. v. Kielon*, 112 App.Div.2d 709, 492 N.Y.S.2d 502, 503 (1985). When a term in an insurance policy is clear and unambiguous, it is to be understood in its "plain, ordinary and popular sense." *Cook v. City of Geneva*, 127 Misc.2d 261, 485 N.Y.S.2d 497, 500 (Sup.Ct. 1985). We agree with the district court's conclusion that the territorial provision is unambiguous on its face. The Dresser-Santini contract provided that the packaged equipment stored in the open yard would be continuously covered with certain protective materials and that Santini would provide security measures to guard against theft or vandalism. In addition, Dresser was charged for such storage after thirty days. Because the contract clearly contemplated that Dresser's equipment would be stored at the Santini yard, and the equipment, in fact, was stored for up to three months, we find that the packaging was intended for use or consumption in the United States. We do not suggest that Truck's policy would cover *any* of Santini's

overseas export packaging merely because the products were shipped from a United States port. In this instance, the parties clearly intended the packaging material to protect the equipment from moisture and possibly other damage, not only during the overseas shipment, but also while it was stored in the Santini yard.

Truck also claims that, even if the property damage occurred in the policy territory, the "care, custody, or control" provision alone excludes coverage for any damage that occurred while the packaging material was in Santini's yard. Although Truck denied coverage before the district court, it did not rely on the care, custody, or control exclusion in its arguments or pleadings. Truck now asserts that the exclusion was placed in issue when Atlantic offered the Truck policy into evidence at trial.

To prove the applicability of the exclusion, as New York law requires, Truck would have had to raise this provision and argue its applicability to the district court. An issue raised for the first time on appeal generally is not considered unless it involves a purely legal question or failure to consider it would result in a miscarriage of justice. *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1117 n. 20 (5th Cir.1985); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1549 (5th Cir.1984). In *Nissho-Iwai*, we declined to interpret a contractual clause that was not raised at trial, although the contract had been admitted into evidence. 729 F.2d at 1549. We concluded that interpretation of the clause might involve issues of fact. *Id.* In this case, the application of the "care, custody, or control" exclusion depends on whether Santini had exclusive control of the property, *Stewart Warner Corp. v. Burns International Security Services, Inc.*, 527 F.2d 1025, 1029 (7th Cir.1975), which is a question of fact not addressed by the district court. Consideration of this exclusion on appeal would be prejudicial to Atlantic, which was not given the opportunity at trial to present evidence concerning the control matter. Accordingly, we find that Truck cannot argue on appeal that this

provision excludes coverage. We thus affirm the district court's ruling that Truck's policy provided coverage to Santini in respect to Dresser's claim against it.

### Atlantic's Recovery from Truck

#### 1. Relative Specificity of Coverage

Truck further contends that, even if its policy covers the property damage, it is not liable to Santini in this instance because Atlantic's policy specifically covers the type of loss at issue while the Truck policy provides more general coverage. Both policies cover liability for various types of property and other damage. The Atlantic policy specifically provides coverage for Santini's liability as a packer, but does not limit the coverage to such liability. Truck's policy coverage clearly includes this type of damage, although the policy does not specifically address Santini's responsibility as a packer. In addition, both policies contain "other insurance" clauses, which limit the policy coverage to "excess" when other insurance is available.

■ The district court concluded that there is no difference in specificity between the two policies. We find that, even if Atlantic's contract could be interpreted as providing somewhat narrower coverage, both insurers are liable because both policies insured Santini for the loss at issue. New York law, which we have held to be applicable, rejects Truck's specific coverage theory. *State Farm Fire & Casualty Co. v. LiMauro*, 65 N.Y.2d 369, 492 N.Y.S.2d 534, 537, 482 N.E.2d 13, 16 (1985). In *Federal Insurance Co. v. Atlantic National Insurance Co.*, 25 N.Y.2d 71, 302 N.Y.S.2d 769, 250 N.E.2d 193 (1969), the New York Court of Appeals addressed two insurance policies that covered the asserted loss, but each provided coverage in excess of other applicable policies. One company argued that the other company's policy provided the primary coverage because it more specifically covered the loss. The court reasoned that any attempt to decide which

policy was more specific would be an exercise in "meaningless semantics," and thus concluded that both companies were liable because both policies afforded coverage. *Id.* 302 N.Y.S.2d at 195, 250 N.E.2d at 196. *See also Consolidated Edison Co. of New York, Inc. v. Aetna Insurance Co.*, 601 F.Supp. 1024, 1027 (E.D.N.Y.1985). We therefore conclude that any difference in specificity between the two policies does not warrant finding that Truck's policy provides coverage in excess of that provided by Atlantic's policy.

#### 2. Apportionment

■ Under New York law, similar "other insurance" provisions, providing coverage in excess of that provided by other policies, in two applicable insurance policies cancel each other out so that neither provision is enforced to shift primary coverage to the other policy. The result is that liability generally is prorated between the two carriers based on their relative policy limits. *LiMauro*, 492 N.Y.S.2d at 538, 482 N.E.2d at 17; *Lumbermens Mutual Casualty Co. v. Allstate Insurance Co.*, 51 N.Y.2d 651, 435 N.Y.S.2d 953, 955, 417 N.E.2d 66, 68 (1980); *Public Service Mutual Insurance Co. v. Fireman's Fund*, 82 App.Div.2d 403, 441 N.Y.S.2d 677, 679 (Sup.Ct.1981), *aff'd*, 55 N.Y.2d 868, 448 N.Y.S.2d 154, 433 N.E.2d 137 (1982). The parties agree that the liability should be proportionate to the policy limits,[3] but Atlantic contends in its cross-appeal that the entire line of insurance available to Santini based on Truck's primary insurance should be considered in determining the relevant policy limits. Truck provided insurance coverage to Santini for property damage liability not to exceed $1,000,000. Santini purchased excess coverage from Aetna and Midland for liability that exceeds Truck's policy limit, but these excess policies cannot be reached until Truck's primary coverage has been exhausted. In seeking contribution from Truck, Atlantic did not sue Aetna or Midland, nor did Truck join these

3. Atlantic argues primarily that liability should be apportioned according to the policy limits, but asserts alternatively that, if the excess layers are not to be considered, the loss should be prorated equally rather than on the basis of the policy limits.

companies as parties, because Aetna and Midland clearly have no responsibility for a loss that falls within Truck's policy limit. In fact, Altantic's proration theory would permit Atlantic to recover indirectly from Truck funds that it cannot recover directly from the excess insurers. Therefore, we believe that the district court correctly held that the limits of the excess policies should not be considered "when the settlement is within the limits of the primary insurance company." [4]

Atlantic relies upon *Gilkey v. Andrew Weir Insurance Co.*, 291 F.2d 132 (9th Cir.1961), and *St. Paul Mercury Insurance Co. v. Underwriters at Lloyds of London*, 365 F.2d 659 (10th Cir.1966). In each of these cases, the court considered the policy limits of excess insurers in prorating the liability, but the damages at issue exceeded the primary policy limits. Atlantic observes that the court in *St. Paul* considered two policies issued by Lloyds—one policy covered the excess over the primary policy from $25,000 to $125,000; the other provided coverage from $125,000 to $500,000. The damages exceeded the primary policy, but did not exhaust the first excess Lloyds policy extending coverage to $125,000. The court reasoned that both the Lloyds policies should be considered because they provided continuous coverage for the same risk. 365 F.2d at 663. We acknowledge that the limits of excess coverage provided by the *same* insurer might appropriately be considered in prorating liability, but we are

faced in this instance with excess coverage provided by other, unrelated insurers.[5]

Atlantic also cites *Canal Insurance Co. v. Ranger Insurance Co.*, 489 F.Supp. 492 (D.S.C.1980), in which the court prorated the liability based on the excess coverage, even though the loss paid in the underlying suit did not exceed the primary coverage. Applying Florida law, the *Canal* court reached its decision based on a sole Florida case, *Hartford Accident & Indemnity Co. v. Liberty Mutual Insurance Co.*, 277 So.2d 775 (Fla.1973). Similar to the situation in *St. Paul, Hartford* concerned excess coverage provided by additional policies issued by the same company that issued one of the primary policies. The Florida Supreme Court determined that the excess policy limit should be considered when more than one of the company's policies were involved in a single accident. *Id.* at 778.

We find the reasoning of *Liberty Mutual v. Truck Insurance Exchange*, 245 Or. 30, 420 P.2d 66 (1966), more persuasive as to the case before us. The Oregon Supreme Court concluded that, because the excess carriers were not bound to pay any amount until the primary coverage was exhausted, their policies provided no applicable insurance coverage to be prorated for a loss below the primary coverage. *Id.* 420 P.2d at 69.

Moreover, we believe that the New York courts would consider only the respective limits of the primary policies in this in-

---

4. Atlantic's reply brief discusses several hypotheticals, illustrating that when the total loss exceeds a primary insurer's limits, the primary insurer's proportionate *contribution*—based on the limits of the excess insurers—may not exceed the primary insurer's limit, and the primary insurer will thus pay a higher proportion of the loss without any aid from its excess insurers. Atlantic suggests that this scheme is too arbitrary, because when the total loss is within the primary insurer's limit, the primary insurer pays a much lower proportionate share than when the loss barely exceeds the limit. However, it appears that under Atlantic's proposed scheme, the primary insurer would more often pay a higher proportion of the loss without the help of the excess policies (as in this case). Although consideration of the primary policy limits may have some arbitrary results, it

is reasonable to consider only the primary insurer when the total loss is within the primary policy limits because the primary insurer has taken responsibility for all that loss. When the loss exceeds the responsibility taken by the primary insurer, the excess policies should be considered because in that event the excess layers would have been reached in the absence of concurrent coverage.

5. One reason for considering excess layers issued by the same insurer as continuous coverage would be to prevent a carrier from issuing several layers of coverage in small increments in an effort to avoid paying its proportionate share of the risk when other policies provide concurrent coverage.

stance. In *Lumbermens*, the Court of Appeals addressed the proper apportionment of liability among three nonprimary policies in a case in which the primary policy had been exhausted. The court departed from the general rule that each excess insurer contribute in proportion to its policy limit, based on the court's interpretation of the parties' intent for each policy. The court determined that, of the two excess policies issued by Allstate, one was clearly intended to provide excess insurance over the other, and that the third policy, issued by another carrier, was intended as excess over any excess policies. Thus, the court held that the policies must be exhausted in their order of intended coverage. 435 N.Y.S.2d at 955, 417 N.E.2d at 68.

The Court of Appeals again addressed this exception from the general rule of proration in *LiMauro*. The court determined that the "rule to be distilled" from *Lumbermens* and similar cases is that

"an insurance policy which purports to be excess coverage but contemplates contribution with other excess policies or does not by the language used negate that possibility must contribute ratably with a similar policy, but must be exhausted before a policy which expressly negates contribution with other carriers, or otherwise manifests that it is intended to be excess over other excess policies."

492 N.Y.S.2d at 539, 482 N.E.2d at 18. Because the nonprimary policy at issue in *LiMauro* specifically provided that it "shall be in excess of, and shall not contribute with" other collectible insurance, the court held that its policy limits should not be considered unless the primary policies were exhausted. *Id.*, 492 N.Y.S.2d at 541, 482 N.E.2d at 20. Yet, the court did not indicate that such an express intent was required before an excess carrier's limits would not be considered. The intent of the policy may be evidenced by its stated coverage, the premiums paid for it, and its wording concerning excess insurance. *Id.*, 492 N.Y.S.2d at 538, 482 N.E.2d at 17. The court also noted that "while the scheduling of an underlying policy may be indicative of an intent that the policy in which it is scheduled is to be excess over the scheduled policy," the absence of such a schedule does not negate an intent to provide excess coverage. *Id.*, 492 N.Y.S.2d at 541, 482 N.E.2d at 20. We find that the Midland and Aetna policies clearly intend to provide excess coverage over Truck's policy and do not contemplate contribution with other applicable insurance unless Truck's policy has been exhausted.

 We believe that our reading of the New York decisions in this area, as well as the better reasoned decisions in other jurisdictions, support the conclusion that the Midland and Aetna policy limits should not be considered because the total loss does not exceed that covered by Truck's primary policy. We therefore affirm the district court's proration of the liability based on the respective limits of the policies issued by Truck and Atlantic.[6]

### 3. Settlement Amount

Finally, Truck challenges the district court's determination that Santini's settlement with Dresser was reasonable. Truck contends that some elements of the damages alleged by Dresser, such as "unseen moisture damage" and lost profits on the spare parts that Dresser provided CNTIC, are not recoverable because they are speculative and unforeseeable. However, the appropriate inquiry is not whether the claimed damages are recoverable, but whether the settlement amount is reasonable.

 New York law provides that when an insurer unjustifiably refuses to defend, it cannot escape liability for the reasonable settlement of a covered risk. Because Truck's policy covers the property damage liability and it unjustifiably re-

---

**6.** We also affirm the district court's equal apportionment of Atlantic's defense costs of the suit against Santini. Because Truck and Atlantic had equal obligations to defend Santini, defense costs should be apportioned equally between them. See *Emons Industries, Inc. v. Liberty Mutual Fire Insurance Co.*, 481 F.Supp. 1022, 1027 (S.D.N.Y.1979); *Allstate Insurance Co. v. Aetna Casualty & Surety Co.*, 123 Misc.2d 932, 475 N.Y.S.2d 219 (Sup.Ct.1984).

fused to defend when properly called on to do so, it is liable for its appropriate share of any reasonable settlement negotiated in good faith. *Servidone Construction Corp. v. Security Insurance Co.*, 64 N.Y.2d 419, 488 N.Y.S.2d 139, 142, 477 N.E.2d 441, 444 (1985) (citation omitted). *See also* 7C J. Appleman, *Insurance Law and Practice* § 4690 (1979); *HS Equities, Inc. v. Hartford Accident & Indemnity Co.*, 609 F.2d 669 (2d Cir.1979). The reasonableness of the settlement is a question of fact, *Emons Industries, Inc. v. Liberty Mutual Fire Insurance Co.*, 481 F.Supp. 1022, 1027 (S.D.N.Y.1979), the determination of which we will not set aside unless clearly erroneous.

■ Before negotiating the settlement amount with CNTIC, Dresser repaired much of the damaged equipment. Atlantic presented evidence at trial concerning Dresser's costs for labor, replacement parts, and freight and handling for shipping the replacement parts in repairing the equipment. In June 1978, Dresser negotiated its first settlement with CNTIC, in which Dresser furnished spare parts in lieu of money for moisture damage to certain instrument panels. Under the final settlement in October 1978, Dresser provided additional spare parts in lieu of money for delay penalties for the time Dresser spent repairing the equipment and for unseen moisture damage. The final settlement also concerned disagreements over whether Dresser met the contract specifications. In its claim against Santini, Dresser asserted that fifty-one percent of the final settlement amount was attributable to moisture damage. Dresser sued Santini for the losses it incurred in repairing the equipment and settling with CNTIC. In its original complaint, Dresser claimed that Santini's failure to properly package the equipment caused Dresser $1,288,177 in damages.

Seeking treble damages under the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Comm.Code Ann. § 17.41 *et seq.*, based on asserted breach of Santini's express warranty, Dresser sued Santini for $3,864,351.[7]

Truck argues that the $850,000 that Atlantic paid in settling with Dresser is unreasonable because Dresser would not have been able to recover against Santini for any losses based on the asserted unseen moisture damage or on Dresser's lost profits. Dresser and CNTIC never specified the amount of damages attributable to unseen moisture damage. Based on the extensive visible and verifiable damage that the moisture caused to the equipment, it was reasonable for Dresser to consider potential moisture damage that was not visible or the diminished market value of the equipment resulting from such damage in negotiating its settlement with CNTIC. The settlement was also based on delay damages clearly attributable to the moisture damage. Moreover, Dresser's claim for lost profits on spare parts could be found not unreasonable because there was evidence that CNTIC had no other source for the spare parts and was likely to purchase them had they not been provided. Even if CNTIC would not have purchased the spare parts, it could be found not unreasonable to include an anticipated profit in calculating the market value of the parts.

We cannot say that the district court's finding that the settlement was reasonable is clearly erroneous because neither of the contested elements of damages are clearly unrecoverable, because Dresser's claim was based on several other significant losses not challenged by Truck,[8] and because of Santini's potential exposure to treble damages. Furthermore, Atlantic's lawyers, who furnished the defense to Santini in the suit by Dresser, testified that they

7. Although the Dresser-Santini suit was settled before Dresser amended its complaint, it appears that Dresser had recalculated its loss to be $1,451,623 and intended to seek treble damages based on this revised figure.

8. However, we note that Dresser's revised calculations indicate that it attributed $737,818 of the total $1,451,623 loss to lost profits. Nevertheless, we conclude that the possibility that Dresser may not have recovered the full $737,818 does not make the settlement unreasonable as a matter of law.

negotiated the settlement with Dresser at arm's length and in good faith, and Truck did not present any contrary evidence. Accordingly, considering all these factors, we cannot say with firm conviction that a mistake has been committed, and thus we affirm the district court's finding that the settlement was reasonable. *See O'Malley v. United States Fidelity & Guaranty Co.,* 776 F.2d 494, 497 (5th Cir.1985).[9]

### Conclusion

Finding that neither Truck nor Atlantic has presented any ground for reversal, we affirm the district court's judgment.

AFFIRMED.

[9.] Finally, we also uphold the district court's denial of Atlantic's request for attorneys' fees because New York law generally does not provide for recovery of attorneys' fees in an action such as this to enforce an insurer's obligation. *Niagara County v. Utica Mutual Insurance Co.,* 80 App.Div.2d 415, 439 N.Y.S.2d 538 (1981), *appeal dism'd,* 54 N.Y.2d 608, 443 N.Y.S.2d 1030, 427 N.E.2d 1191 (1981); *Allstate Insurance Co. v. Aetna Casualty & Surety Co.,* 123 Misc.2d 932, 475 N.Y.S.2d 219 (Sup.Ct.1984).