[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter arises out of a motor vehicle accident which occurred on May 26, 1992 on Wolcott Road in Wolcott, Connecticut. At the time of the accident the plaintiff Rosemary Gambino was a passenger in a car then owned and being operated by her daughter Roxanne Zappone. Mrs. Gambino has collected the full proceeds of $20,000 of the insurance policy which insured the car in which she was a passenger. Mrs. Gambino is now suing the defendant, Safeco Insurance Co. of Illinois (Safeco) on whose policy she was a named insured (Joint Exhibit 1). Also the plaintiff may be an insured under another daughter's, Tammy Rossignol, automobile insurance policy with Amex Assurance Company (Amex) (Joint Exhibit 2). The Safeco policy has limits of $300,000.00 and the Amex policy limits of $100,000.00. The defendant Safeco alleges that Amex is liable to pay twenty-five (25%) percent of any award that the plaintiff wins in this matter and that they (Safeco) are liable for seventy-five (75%) percent of any such award. Subsequent to this trial there will be an arbitration hearing between the plaintiff and Amex in accordance with the provisions of that policy according to the attorneys for each party in this matter. On the date of this accident, the plaintiff's daughter Tammy Rossignol lived with her.
The plaintiff testified that at the time of the accident she and her daughter Roxanne Zappone were on their way to pick up her mother and then they were all going to dinner. The plaintiff was a passenger in the right front seat of the vehicle her daughter was operating. She testified she was having trouble with her seat belt and she was trying to adjust it. Her daughter, Roxanne Zappone testified that this seatbelt problem caught her attention and she looked at plaintiff. She stated when she looked up she was going to hit a car in front of her which was then stopped and waiting to turn left. She stated she applied her foot to the brakes and she slowed down and slid into said car. Mrs. Gambino stated that the accident occurred at approximately 6:00 p.m. and that it had just started to rain. The plaintiff testified that just before the collision her daughter said "Ma, I can't stop, we're going to hit" and the next thing she knew she was on the floor of the vehicle under the dash board. She said she had severe pain in her left arm CT Page 6570 and could not move. She testified a police officer and an ambulance attendant who were called to the accident scene got her out of her daughter's vehicle and put her on a stretcher. She was taken to St. Mary's Hospital where she remained a patient until May 30, 1992 when she was discharged.
The plaintiff testified that she sustained injuries from the accident to her left arm, shoulder, both legs and knees. She stated that her left arm swelled up immediately after the accident as did her legs which were also black and blue for two months after the accident. Doctor Richard Matza's report states that she suffered a fractured proximal humerus, and a left knee sprain from this accident. He performed a Neer Acromeoplasty on her left shoulder under general anesthesia on April 2, 1993 for another injury he says is causally connected to this accident.
The plaintiff testified that when she went home from the hospital she had a lot of pain in her shoulder, neck and legs and as a result, she was confined to bed for a couple of months after the accident. She stated she was in therapy for over one year for her arm, neck shoulder and legs. She stated that today she still has pain in her arm and shoulders depending on the weather. She stated that today she can only lift her left aim to shoulder level and she cannot put her arm behind her back.
As a result of this accident she testified that she can not move her furniture around, dig her garden or tend to her garden all of which she did prior to the accident. She use to bowl once a week prior to the accident but she cannot do it any longer because of the accident. She states that for a long time after the accident she could not watch her grandchildren. She is now able to watch them but she cannot lift them. Prior to the accident she testified that she would go roller skating with her grandchildren but that she can no longer do that since the accident. She stated that she still drives an automobile but that she now has a fear of driving because of this accident. The plaintiff has a scar on the top of her shoulder from the April 2, 1993 accident which is about one and one-half (1-1/2") inches long. She stated that her arm bothers her when she washes the floor in her home or washes her hair. The plaintiff stated she no longer treats with Doctor Matza because he can do nothing else for her. When she has pain now she takes an advil to relieve it.
Prior to the accident the plaintiff worked as a waitress at CT Page 6571 a local diner. She stated she earned $3.50 per hour plus tips and she worked about thirty (30) hours per week or up to forty (40) hours per week if needed. After the accident she was out of work until August or September, 1993 according to her testimony. However, when she returned to work she could not wash dishes or lift or carry heavy loads as she did before the accident. The defendant's Exhibit 5 is a Wage and Salary Verification Form signed by her employer. That form stated that as of June 2, 1992 she earned $4.27 per hour and worked fifteen (15) to twenty (20) hours per week.
On direct and cross examination of the plaintiff, it was elicited from her that she had two prior motor vehicle accidents on March 8, 1988 and October 6, 1989 and for which she was treated by Doctor Frank Cucolo. (See Exhibits Two and Three). According to Doctor Cucolo's report of the March 8, 1988 accident, she experienced neck and shoulder pain, as well as pain and stiffness in her mid and low back. She also complained to him of frequent severe headaches and feeling sore all over. Doctor Cucolo diagnosed her with an acute hyperextension — flexion injury to the cervical spine whiplash injury; attendant myofascitis and radiculitis of the cervical musculature and rated her with a five (5%) percent permanent partial impairment to the cervical spine as a result of the injuries received in the March 8, 1988 automobile accident. (Exhibit 2).
As to the October 6, 1989 automobile accident, Doctor Cucolo states in his report of November 27, 1989 that Mrs. Gambino's current subjective symptoms include neck and shoulder pain and stiffness with frequent headaches. He stated Mrs. Gambino also complains of lower back pain and stiffness to a lesser degree. In Doctor Cucolo's report of July 18, 1990, he again states Mrs. Gambino has a five (5%) percent permanent partial impairment of the cervical spine. In that report which is part of Exhibit 3, the court believes he is referring to the October 6, 1989 automobile accident.
Mrs. Gambino testified that she did not remember if she told St. Mary's Hospital, Doctor Matza or Doctor Ferraro about her automobile accidents of March 8, 1988 and October 6, 1989. She stated her shoulder pain from those accidents was in the back of the shoulders and that the shoulder pain from this accident was emanating from the front of the left shoulder. She stated that at St. Mary's Hospital she did tell them about injuries to her low back in the early 1980's. Since this CT Page 6572 accident, the plaintiff testified she fell and broke her wrist at work.
In Doctor Richard Matza's report of December 6, 1993, he states that the plaintiff has reached maximum medical improvement relative to her left shoulder and that she has a thirty (30%) percent permanent partial disability of the left shoulder. (Exhibit D). In Doctor Matza's deposition of May 5, 1995, he testified that based on reasonable medical probability, the permanent partial disability of the left shoulder was related to the May 26, 1992 accident. (Exhibit B, page 18). Doctor Matza said he based his opinions on "the absence of symptoms prior to the May of '92 injury, and the documentation of the injury, the date it occurred by me, and the subsequent surgery and follow-up, which were related to that accident and the injuries that occurred in that accident. (Exhibit B, page 18). In that same deposition on page 26, Doctor Matza stated it was possible that the fraying he observed in the plaintiff's left shoulder during her operation of April 2, 1993 could have predated the May, 1992 auto accident. Further on in that deposition on pages 36 and 37, Doctor Matza states the fact that she had other automobile accidents in March, 1988 and October, 1989 would not change his opinion that the injuries he treated the plaintiff for since May of 1992 were related to the May, 1992 accident. Doctor Matza also reviewed reports of Doctor Frank Cucolo dated April 6, 1990, July 18, 1990 and August 18, 1989 relative to the automobile accidents in which the plaintiff was injured on March 8, 1988 and October 6, 1989. He testified in the aforementioned deposition that these reports had no effect on his previous opinions concerning the relationship of his treatment and the conditions he diagnosed arising out of the May 26, 1992 accident. Dr. Matza was asked what complaints did Mrs. Gambino have that differed from the reports by Doctor Cucolo? He answered,
 "Well she had neck, headaches trapezial shoulder pain. That is what he is calling shoulder pain, or she is calling shoulder pain. It is not the shoulder joint that we are talking about in the previous injuries. It is the muscle bridging the neck to the shoulder and that is not what we are talking about in this new injury.
 In the May of '92 injury, she had an injury to the shoulder itself, and the arm below the shoulder." CT Page 6573
(Exhibit B, page 38).
Doctor Robert Ferraro examined the plaintiff for the defendant on September 9, 1994. (Exhibit 4). He stated that in his opinion the plaintiff had reached maximum medical improvement and that she had a twenty (20%) percent impairment of the left upper extremity. Doctor Ferraro also stated, "Further, it would be my best medical opinion that this impairment is on the basis of injuries sustained in the accident of 5/26/92 as there is no apparent evidence of pre-existing condition.
It should also be stated that the plaintiff testified she had two prior back operations. However, the court does not know the reason for these back operations, who performed them, or when they occurred.
The defendant argued to the court that the only injury that was causally connected to the plaintiff's May 26, 1992 accident was the fracture of the proximal humerus and that none of her other injuries, specifically the left Neer Acromioplasty were proven to be the result of this accident. The plaintiff argues otherwise.
From the evidence, the court finds that the plaintiff was injured in the automobile accident of May 26, 1992 and sustained a fractured proximal humerus, left knee MCL sprain, bruises about the body and injury to her left shoulder for which a left Neer Acromioplasty procedure was performed. As a result of these injuries, the plaintiff's medical bills totalled $17,487.11. (Exhibit A). Therefore after hearing the evidence, the court finds the issues for the plaintiff on the complaint.
The defendant has filed five special defenses to this action. As to the first, second and third special defenses, the court finds the issues for the defendant. As to the fourth special defense, the court finds that the defendant did not sustain its burden or proof thereon. The defendant's fifth special defense will be discussed hereinafter.
At the time of the accident, the plaintiff was covered under her own auto insurance policy issued by the defendant, Safeco. In addition, her daughter lived in the plaintiff's home and therefore the plaintiff was a covered person under her said CT Page 6574 daughter's policy with AMEX Assurance Company.
The Safeco policy contains the following provision:
 If there is other applicable similar insurance we will pay only our share. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide with respect to a vehicle you do not own shall be excess over any other collectible insurance.
Safeco Policy, p. 7 of the "Policy Section") (Exhibit 1.) Similarly, the AMEX policy provides as follows:
 If there is other applicable similar insurance, we will not pay for any damages which would duplicate any payment made for damages under such similar insurance. However, any insurance we provide with respect to a vehicle you do not own, to which other similar insurance is applicable, shall be excess over such other applicable insurance.
AMEX Policy, p. 14.) (Exhibit 2.) The plaintiff has made claims for underinsured motorist benefits under both policies. The claim against AMEX is in arbitration, the claim against Safeco is presently before the court.
In its fifth special defense, Safeco alleges that
 1. Pursuant to the Other Insurance Clause of Part C — Uninsured Motorist Coverage of the policy (No. K1055718), any insurance the defendant provides with respect to a vehicle not owned by Rosemary Gambino shall be excess over any other collectible insurance.
 2. The plaintiff is a covered person under an auto insurance policy issued by AMEX Assurance Company (No. 0027944301), which policy provides underinsured motorist coverage.
 3. The defendant's coverage is excess over such AMEX coverage or should be prorated with such AMEX coverage. CT Page 6575
The issue raised by this factual scenario is (1) which policy provides primary coverage, if any, and (2), in the event that both policies are excess policies under their own "other insurance" clauses, how is coverage apportioned between the two insurers. As noted by counsel during the trial of this matter, the issue before the court will not affect the amount, if any, recovered by the plaintiff, but will only affect the apportionment of coverage between Safeco and AMEX.
"`[O]ther insurance' clauses are valid for the purpose of establishing the order of coverage between insurers, as long as their enforcement does not compromise coverage for the insured."Aetna Casualty Surety Co. v. CNA Insurance Co., 221 Conn. 779,783, 606 A.2d 990 (1992). "Public policy is not violated when "other insurance" clauses are used for the purpose of establishing the order of payment between insurers. When the insured is afforded full indemnification for a loss, there is no public policy issue controlling how insurers divide coverage among themselves." (Citations omitted.) Id., 785. "[I]f a careful reading of the language of the policies in their entirety reconciles any conflict or ambiguity that may arise when identical or similar 'other insurance' clauses exist, and if the enforcement of the clauses would not produce adverse consequences for the insured, then the clauses should be enforced as written." Id.
Aetna Casualty Surety Co. v. CNA Insurance Co., supra,221 Conn. 779, is instructive with respect to the present issue. In Aetna Casualty v. CNA, the insured was injured in an accident with an underinsured motorist while operating her father's automobile, and she was therefore a "covered person" under her father's policy issued by Aetna. At the time of the accident, the insured was also a resident of her sister's household, and was therefore a "covered person" under the sister's automobile insurance policy. Both policies contained the following "excess insurance" clauses: "[a]ny insurance we provide with respect to a vehicle you do not own, to which other similar insurance is applicable, shall be excess over such other applicable insurance." Id., 787. This language is almost identical to the "other insurance" language of both policies in the present case.
The court construed this language to mean that the "policy . . . would be excess in situations where the covered person was injured in a vehicle 'you' do not own." Id., 787. As in CT Page 6576 the present case, the policy defined "you" as the named insured.
Id.[1]
The court held that
 the Aetna policy, by its own terms, does not envision being excess in this situation because the claimant was injured while occupying a vehicle owned by [her father], the named insured in the Aetna policy. Therefore, the Aetna policy is primary and its "other insurance" clause does not apply. Conversely, the CNA policy is excess because the claimant was not injured while an occupant in a vehicle owned by [her sister], the named insured in the CNA policy. The only reason CNA is providing underinsured motorist coverage is because the claimant is a resident relative of the named insured(s), and thus, a covered person under the CNA policy. We find no conflict between the policies because only one insurer, Aetna, could be primary. The policies themselves, therefore, dictate that we hold that the Aetna underinsured motorist coverage be primary and that the CNA underinsured motorist coverage be excess.
Id., 787.
In the present case, however, the plaintiff was injured in a motor vehicle not owned by either the "person named under the Declarations" as defined in the Safeco policy, i.e., the plaintiff, or "the Policyholder" as defined in the AMEX policy, i.e., the plaintiff's daughter. Accordingly, the "other insurance" clauses of both policies are applicable to the loss suffered in this case and the language of the policies dictates that they are to be considered excess policies.
Aetna Casualty Surety Co. v. CNA Insurance Co., supra,221 Conn. 779, is silent as to the issue of multiple excess coverage.[2] However, other superior court cases have addressed the issue of competing "excess insurance" provisions, holding that where both policies are determined to be excess,
 the cases suggest the best solution is to treat both as primary and prorate the loss. Atlantic Mutual Ins. Co. v. Trust Ins. Exchange, 797 F.2d 1288, 1294-9 5th CT Page 6577 Cir. (1986). Continental Can Co. v. Hartford Acc. Indem. Co., 28 Cal.Rptr. 606, 609-612, 213 Cal.App.2d 78, (1963) . . . .
* * * *
 "But where excess [clause] conflicts with excess [clause], as a rule, the common approach is to hold them to be mutually repugnant and require them to share the risk the same as if both were primary. They do not, in fact, become primary policies, but they are treated as if they were primary and generally prorated in accordance with policy limits." Appleman, Insurance Law and Practice Vol. 8A § 4906.
O'Brien v. United States Fidelity Guaranty Co., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 704626 (Sept. 1, 1994, O'Neill, J.); see also StateFarm Mutual Insurance Co. v. Fuller, 7 CSCR 770 (May 15, 1992, Austin, J.).
This result is consistent with the rule that "[w]here two policies contemplate the particular risk equally, liability will be prorated based on the total policy limits"; Sacharko v.Center Equities Ltd. Partnership, 2 Conn. App. 439, 447,479 A.2d 1219 (1984); and is the result suggested by commentators on Connecticut uninsured motorist coverage. See J. Berk M. Jainchill, Connecticut Law of Uninsured and Underinsured Motorist Coverage, (1993), §§ 9.3.1 9.3.2, pp. 299-301. Accordingly, this court finds that the loss should be prorated between the defendant, Safeco Insurance Co. of Illinois and Amex Assurance Company in accordance with the policy limits. Safeco's coverage limit is $300,000.00 and Amex's coverage limit is $100,000.00. Therefore Safeco shall pay seventy-five (75%) percent of the judgment in this case and Amex twenty-five (25%) percent of said judgment, with the appropriate set offs and/or credits.
After hearing the evidence, the court awards the plaintiff, Rosemary Gambino economic damages of $17,487.00 which represents her medical bills and $3,907.05 in lost wages for total economic damages of $21,394.05. The court finds that the plaintiff lost 15 hours of work per week for the period May 26, 1992 to August 1, 1993 (sixty-one (61) weeks) at an hourly rate of $4.27. (See Defendant's Exhibit 5.) The court also finds that the plaintiff CT Page 6578 is entitled to non economic damages of $154,605.95. Thus the court finds the total damages to be $176,000.00 plus costs. Of this sum, Safeco is liable for seventy-five (75%) or $132,000.00 and Amex is liable for twenty-five (25%) percent or $44,000.00.
It was stipulated to by the parties that Safeco paid no fault benefits in the amount of $10,000.00 and that when the plaintiff collected $20,000.00 from the tortfeasor she paid back to Safeco $6,666.67 leaving a balance due on the no fault benefits paid of $3,333.33.
It was also stipulated to by the parties that the total set off against any award was $31,356.22. This figure is computed as follows:
Tortfeasors Payment $20,000.00
 Paid by Plaintiff's Group 8,022.89 Health Insurance
 Balance of No Fault Benefit 3,333.33 Paid to Plaintiff by Safeco ---------- $31,356.22
It was also stipulated to by the parties that the total medical payments of $17,487.00 was paid as follows: $8,914.11 by Safeco, $550.00 by the plaintiff personally and $8,022.89 by the plaintiff's Group Health Insurance.
Thus Safeco is due a credit of $21,017.17 (75% of $28,022.89) plus $3,333.33 credit for No Fault payment or a total of $24,350.50.
Amex is due a credit of $7,005.72 (25% of $28,022.89).
Thus the court orders Safeco to pay a total of $107,649.50 of said judgment ($132,000.00 less $24,350.50) and Amex a total of $36,994.28 ($44,000.00 less $7,005.72) of said judgment.
Judgment may enter accordingly.
WILLIAM J. SULLIVAN, J.